IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

SHAILINI SINGH,

                Plaintiff,

v.                                CIVIL ACTION NO.  3:11-cv-00701

ROBERT C. NERHOOD, et al.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' motion to dismiss for lack of subject matter jurisdiction and failure to state a claim [Docket 13]. For the reasons that follow, Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part.

### I.    FACTUAL BACKGROUND

This action arises out of the termination of Plaintiff Shailini Singh's employment with the Marshall University School of Medicine ("School of Medicine"). Plaintiff alleges not only that her termination was unlawful and motivated by discriminatory purposes, but also that Defendants engaged in tortious conduct in an effort to drive her from the Huntington, West Virginia medical community.

Plaintiff is a citizen of the State of New York. (Docket 1 ¶ 1.) Plaintiff alleges that Defendants Robert C. Nerhood, David G. Chaffin, Jr., David C. Jude, and Charles H. McKown, Jr. (collectively "Defendants") are citizens of a state other than New York.[1] (*Id.*) At the time of

---

[1] Plaintiff relies on 28 U.S.C. § 1332 as the basis for this Court's subject matter jurisdiction. This statutory provision grants federal courts jurisdiction in civil actions between citizens of different states where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. Plaintiff's failure to allege Defendants'

her employment, Defendants were Plaintiff's professional colleagues at the School of Medicine. At that time, Defendant McKown was the Dean of the School of Medicine. (*Id.* ¶ 7.) Defendant Nerhood was the Chairman of the Department of Obstetrics and Gynecology and Plaintiff's immediate supervisor. (*Id.* ¶ 4.) Defendant Jude replaced Defendant Nerhood in this position in approximately August 2010. (*Id.* ¶ 6.) Defendant Chaffin was employed at the School of Medicine in a professorial capacity similar to Plaintiff's. (*Id.* ¶ 5.) He was also the Director of the Department of Maternal Fetal Medicine. (*Id.*)

The following recitation of facts and allegations are drawn from Plaintiff's Complaint. For the purpose of Defendants' Rule 12(b)(6) motion to dismiss, they are regarded as true. At the time of the allegations giving rise to the Complaint, Plaintiff was employed as a Professor of Obstetrics and Gynecology and Maternal Fetal Medicine at the School of Medicine. (*Id.* ¶ 2.) Plaintiff was the only Board Certified physician in her sub-specialty at the School of Medicine. (*Id.*) She was employed at the School of Medicine both as a professor of medicine and as a clinician. (*Id.* at ¶ 2.) In this capacity, she provided ongoing care and treatment to her patients at Cabell Huntington Hospital. (*Id.* ¶ 9.) Plaintiff established an accredited Perinatal Center at this hospital during her tenure. She was also engaged in medical research. (*Id.* ¶ 10.)

Plaintiff's Complaint alleges a history of animosity between Plaintiff and her colleagues. In October 2009, Defendants Nerhood and Chaffin circulated a memorandum to Plaintiff

---

citizenship with specificity gives the Court reason for pause, as negative jurisdictional allegations often fail to establish diversity of citizenship. *See* 13E Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Practice and Proc.* § 3611 (3d ed. 2012) ("[A] negative statement that a party is not a citizen of a particular state [is generally not] sufficient, since this type of averment does not eliminate the possibility that the person might be a citizen of no state of the United States or other political entity.").

The Court finds these jurisdictional allegations, sparse as they are, sufficiently establish complete diversity among the parties. By averring that Defendants are citizens of states other than New York, Plaintiff "negate[s] the possibility that diversity does not exist." *Contreras v. Thor Norfolk Hotel, L.L.C.*, 292 F. Supp.2d 794, 797 (E.D. Va. 2003) (quoting *Baer v. United Services Auto Ass'n*, 503 F.2d 393, 397 (2d Cir. 1974)); *see Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 199 (4th Cir. 2008) (finding a notice of removal sufficiently averred diversity of citizenship where it alleged that the plaintiff was a citizen of South Carolina and the defendant companies were incorporated and had their principal places of business in states other than South Carolina).

indicating that it was the "policy of the Department of Obstetrics and Gynecology . . . that patient care was secondary to the education of medical students." (*Id.* ¶ 15A.) Plaintiff took issue with this policy, as she interpreted it to require her to sacrifice the health and wellbeing of her patients for the educational benefit of her students. (*Id.* ¶ 15C.) She voiced her concerns to Defendant Nerhood on numerous occasions. (*Id.*)

Another source of contention was the reorganization of the Maternal Fetal Medicine Department. While Plaintiff's Perinatal Center had become quite profitable, the areas of the Department under the control of Defendant Chaffin were much less so. (*Id.* ¶ 13E.) Defendants Nerhood and Chaffin sought to remedy this situation. (*Id.* ¶ 13G.) Defendant Chaffin, who Plaintiff alleges did not share her qualifications, was given shared responsibility over all of Plaintiff's patients. (*Id.*) Previously, each physician had been individually responsible for the care and treatment of his or her patients. (*Id.*) Because Plaintiff believed this reorganization would be detrimental to her patients, she proposed a variety of alternatives which she felt would provide higher quality of care. (*Id.* ¶ 13H.) Plaintiff claims her suggestions were not considered. (*Id.* ¶ 13L.)

On June 26, 2010, Defendant Nerhood notified Plaintiff that her employment had been terminated. (*Id.* ¶ 11.) She had no prior notice of this termination, and was instructed to leave the premises of Cabell Huntington Hospital immediately—even though she had patients waiting on hand for treatment. (*Id.*) Defendant McKown allegedly ratified the termination. (*Id.* ¶ 13O.)

Immediately after her termination, Plaintiff was denied access to her research data that was stored at the School of Medicine. (*Id.* ¶ 28.) She soon entered into discussions with Cabell Huntington Hospital about securing employment there. (*Id.* ¶ 32.) She received a draft employment contract from the hospital, indicating that her employment would commence on September 1, 2010. (*Id.* ¶ 34.) Defendants Jude and Chaffin, with the alleged approval of

Defendant McKown, objected to this prospective employment relationship and so informed the hospital's Chief Executive Officer. (*Id.* ¶ 35.) Plaintiff was informed by the hospital's CEO that Defendants threatened that the relationship between the hospital and the School of Medicine would be negatively impacted if it hired Plaintiff. (*Id.*)

## II.     PROCEDURAL BACKGROUND

The following procedural history is not drawn exclusively from the Complaint. In part, it is evidence that has been provided to the Court in support of Defendants' motion to dismiss. The Court reviews this evidence to evaluate the existence of its subject-matter jurisdiction.

Immediately following her termination, Plaintiff filed a Level One Grievance with the West Virginia Public Employees Grievance Board ("Grievance Board"). (Docket 13-1.) Plaintiff alleged her termination had been motivated by discriminatory purposes based on gender and national origin. (*Id.*) On July 20, 2010, the Grievance Evaluator issued a Report noting that the Level One conference between Plaintiff and the School of Medicine had been adjourned without resolution. (*Id.*)

Plaintiff, through counsel, proceeded to file a Level Two grievance with the Grievance Board on July 28, 2010. (*Id.*) The Level Two mediation was unsuccessful. By Order, the Administrative Law Judge informed Plaintiff of her right to request a Level Three hearing on her grievance within 10 days. (*Id.*) Plaintiff did not request a Level Three grievance hearing. (*See* Docket 17 at 12-13.)

Plaintiff instituted this action on October 5, 2011, invoking the court's diversity jurisdiction. Plaintiff alleges seven specific counts, each incorporating by reference all preceding allegations. Count I asserts a claim for violation of the West Virginia Human Rights Act. Count II is a claim for retaliatory discharge in violation of a substantial public policy. Counts III and IV assert claims for wrongful termination and outrage. Count V is a claim for conversion, asserting

Defendants unlawfully retained Plaintiff's intellectual property after her termination. Count VI alleges intentional interference with a preliminary contract of employment Plaintiff had entered into with Cabell Huntington Hospital after her discharge from the School of Medicine. Finally, Count VII alleges civil conspiracy.

Plaintiff seeks judgment against Defendants for no less than $1,000,000 in compensatory and punitive damages.

On December 5, 2011, Defendants moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. As to their motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), Defendants put forth three arguments. First, Defendants contend Plaintiff failed to comply with a jurisdictional prerequisite to the filing of her Complaint—the pre-suit notice requirements set forth in West Virginia Code § 55-17-3(a)(1). Second, Defendants assert Plaintiff has failed to exhaust available administrative remedies prior to filing this action and accordingly, the Court lacks subject-matter jurisdiction over Plaintiff's claims. Third, Defendants argue the Eleventh Amendment bars Plaintiff's suit.

To the extent the Court is not persuaded by their Eleventh Amendment argument, Defendants move to dismiss based on an assertion of qualified immunity and pursuant to Rule 12(b)(6). Defendants also move to dismiss Count VII of the Complaint, alleging Plaintiff fails to state a claim for civil conspiracy.

### III. STANDARDS OF REVIEW

*A. Subject Matter Jurisdiction*

A Rule 12(b)(1) motion to dismiss challenges the federal court's subject matter jurisdiction over the underlying action. The burden of proving subject matter jurisdiction is on the party asserting federal jurisdiction. When a movant attacks "the existence of subject matter jurisdiction in fact," no presumptive truthfulness attaches to the plaintiff's allegations. *Mortensen*

*v. First Fed. Sav. And Loan Ass'n*, 549 F.2d 884, 891 (3d. Cir. 1977); *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982). Instead, the court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Further, "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Bohrer v. City Hosp, Inc.*, 681 F. Supp.2d 657, 664 (N.D. W. Va. 2010) (quoting *Mortensen*, 549 F.2d at 891). The trial court will "weigh the evidence to determine whether it has subject matter jurisdiction." *Dupont v. United States*, 980 F.Supp. 192, 194 (S.D. W. Va. 1997) (citing *Adams,* 697 F.2d at 1219).

      B.      *Failure to State a Claim*

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint and "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). When reviewing a Rule 12(b)(6) motion to dismiss, the trial court must accept as true the factual allegations in the complaint and "construe the facts and reasonable inferences derived

therefrom in the light most favorable to the plaintiff." *Ibara v. United States*, 120 F.3d 472, 474 (4th Cir. 1997) (citation omitted).

## IV. DISCUSSION

Inasmuch as Defendants' Rule 12(b)(1) motion to dismiss alleges that the Court lacks subject matter jurisdiction over the pending action, the Court addresses this motion and the arguments in support of it first.

### A. Rule 12(b)(1) Motion to Dismiss

#### i. Pre-Suit Notification

Defendants assert that this action must be dismissed because Plaintiff failed to provide requisite pre-suit notice as required by West Virginia Code § 55-17-3(a)(1). In certain actions against a "governmental agency" of the State of West Virginia, this provision requires the complaining party to provide the agency's chief officer and the Attorney General written notice of the alleged claim thirty days prior to filing. West Virginia Code § 55-17-3(a)(1). Defendants contend that as agents of the State of West Virginia, they were entitled to notice under this Code provision. Defendants further suggest that because Plaintiff failed to give the pre-suit notice as called for by this statute, this Court lacks subject-matter jurisdiction over her claims. Plaintiff does not dispute the fact that she did not give notice before filing her lawsuit, but claims the statute is inapplicable because Defendants were not governmental officers as defined by the statute. This Court agrees that the provision has no applicability here, but on different grounds.

West Virginia Code § 55-17-2(1) defines "action" as "a proceeding instituted against a governmental agency in a circuit court or in the supreme court of appeals[.]" Because Plaintiff initiated the pending action in federal court, the pre-suit notice requirement is simply inapplicable. *See also D.W. v. Walker*, No. 2:09-cv-60, 2009 U.S. Dist. LEXIS 42115, *7-8 (S.D.

W. Va. May 15, 2009). Also instructive is West Virginia Code § 55-17-2(2), which defines "government agency" in pertinent part as "a constitutional officer or other public official named as a defendant or respondent in his or her official capacity[.]" Because, as discussed below, the Court construes this action to be against Defendants in their individual capacities, the pre-suit notice statute is also inapplicable on these grounds. For these reasons, Defendants' motion to dismiss for failure to provide pre-suit notice is **DENIED**.

    ii.  *Exhaustion of Administrative Remedies*

Defendants next contend that Plaintiff's failure to exhaust her administrative remedies as provided under the West Virginia Public Employees Grievance Procedure ("PEGP") should result in dismissal for lack of subject matter jurisdiction. Defendants argue that Plaintiff's entire Complaint, including her West Virginia Human Rights Act claims, was subject to this administrative process, and Plaintiff's failure to take full advantage of the relief available through this process forecloses her pursuit of relief in this Court.

The West Virginia Code identifies the PEGP as the exclusive mechanism by which the Marshall University School of Medicine shall hear prospective employee grievances and appeals. W. Va. Code § 18B-2A-4(l) (citing W. Va. Code § 6C-2-1 *et seq.*). The PEGP is a statutorily created administrative system put in place to aid the resolution of employment grievances raised by public employees of the State of West Virginia. W. Va. Code § 6C-2-1(a). The procedure within this administrative system consists of three levels. W. Va. Code § 6C-2-4. After unsuccessful resolution at each preceding level, the employee may request to proceed to the next level of review. At Level One, the aggrieved employee is eligible for a hearing or conference. *Id.* at § 6C-2-4(a). Level Two requires the employee and her employer to participate in alternative dispute resolution. *Id.* at § 6C-2-4(b). Finally, Level Three provides for a hearing

before an administrative law judge ("ALJ"). *Id.* at § 6C-2-4(c). The decision of the ALJ at the Level Three hearing is appealable to the Kanawha County Circuit Court. *Id.* at § 6C-2-5(b).

In addressing Defendants' motion to dismiss, the Court recognizes that

> [W]hen the legislature provides for an administrative agency to regulate some particular field of endeavor, the courts are without jurisdiction to grant relief to any litigant complaining of any act done . . . if such act . . . is within the rules and regulations of the administrative agency involved until such time as the complaining party has exhausted such remedies before the administrative body.

*Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 183 S.E.2d 692, 695 (W.Va. 1971) (citations omitted).

Thus, the Court first addresses which of Plaintiff's present claims, if any, are within the scope of grievances properly addressed to the PEGP.

The West Virginia Code defines "grievance" for purposes of the PEGP as follows:

> (i)(1) "Grievance" means a claim by an employee alleging a violation, a misapplication or a misinterpretation of the statutes, policies, rules or written agreements applicable to the employee including:
> (i) Any violation, misapplication or misinterpretation regarding compensation, hours, terms and conditions of employment, employment status or discrimination;
> (ii) Any discriminatory or otherwise aggrieved application of unwritten policies or practices of his or her employer;
> (iii) Any specifically identified incident of harassment;
> (iv) Any specifically identified incident of favoritism; or
> (v) Any action, policy or practice constituting a substantial detriment to or interference with the effective job performance of the employee or the health and safety of the employee.

W. Va. Code § 6C-2-2(i).

This definition of "grievance" easily encompasses Counts II through V of Plaintiff's Complaint. Counts II, III, and IV identify specific instances of unlawful conduct that Plaintiff alleges motivated the decision to terminate her employment. Though the acts giving rise to Count V took place after the termination of Plaintiff's employment, these alleged acts of conversion are also within the purview of the Grievance Board. Certainly, the extent and scope

9

of Plaintiff's rights to her intellectual property she developed through the course of her tenure with the School of Medicine was a term or condition of her employment.

The Court does not interpret the definition of grievance to include Count VI for interference with contract. As alleged, Plaintiff independently sought out employment with Cabell Huntington Hospital after the termination of her position at the School of Medicine. After she received a draft employment contract from the hospital, Defendants purposefully and maliciously interfered with this employment opportunity. This alleged interference took place after the termination of Plaintiff's employment with the School of Medicine and is factually distinct from Plaintiff's relationship with her former employer. Defendants offer strikingly little to refute the factual basis for this count. For this reason, the Court finds Counts VI and VII, for civil conspiracy, do not fall within the scope of the PEGP's jurisdiction.

Because the analysis requires closer scrutiny, the Court discusses the applicability of the PEGP to Count I below.

Having found that the claims raised in Counts II, III, IV, and V of the Complaint are within the subject matter jurisdiction of the PEGP, the Court now turns to whether Plaintiff was required to exhaust available administrative remedies before initiating this lawsuit.

Under West Virginia law, "[t]he general rule is that where an administrative remedy is provided by statute or by rules and regulations having the force and effect of law, relief must be sought from the administrative body, and such remedy must be exhausted before the courts will act." Syl. pt. 1, *Daurell v. Traders Fed. Savings & Loan Assoc.*, 104 S.E.2d 320, 326 (W. Va. 1958). The exhaustion of administrative remedies generally serves as a jurisdictional prerequisite to the filing of an independent civil action. *See State ex. Rel. Arnold v. Egnor*, 275 S.E.2d 15, 22 (W. Va. 1981). Based on this rule, Defendants contend that Plaintiff's failure to pursue a Level Three grievance hearing is fatal to her suit.

Plaintiff does not dispute the fact that she abandoned her grievance at Level Two of the PEGP nor that she received notice of her right to request a Level Three hearing. Plaintiff also apparently acknowledges the existence of this general exhaustion rule. She relies, however, on the rule's limited exception to justify the abandonment of her grievance.

The law does not require exhaustion of administrative remedies in instances where resort to the available administrative procedures would be futile. *See* Syl. pt. 4, *Sturm v. Bd. of Educ.*, 672 S.E.2d 606 (W. Va. 2008) ("This Court will not require the exhaustion of administrative remedies where such remedies are duplicative or the effort to obtain them futile.") (citations omitted). Plaintiff puts forth two separate rationales to demonstrate that the pursuit of her grievances within the PEGP would have been futile. The Court addresses each in turn.

*1. The Grievance Board's Ability to Award Damages*

First, Plaintiff claims that exhaustion of available administrative remedies would have been futile because the PEGP could not award damages. Plaintiff contends that she initially filed a grievance with the Grievance Board primarily because she sought reinstatement. Plaintiff claims that it became apparent to her after review at Levels One and Two that the School of Medicine was uninterested in reinstating her to her former position. After she perceived reinstatement was no longer a viable remedy, her only remaining request was a request for damages—damages which she claims the Grievance Board could not award. Plaintiff does not dispute that her claims raised in Counts II, III, IV, and V were within the subject matter of the PEGP. Nonetheless, she declined to pursue a Level Three hearing because to do so "would have been costly, time consuming, and would not have resulted in any relief." (Docket 17 at 13.)

Plaintiff's arguments suggest that once she determined it was no longer worth her time to pursue her grievance through the PEGP, she was thereafter excused from participation in the

11

process and free to bring related claims in a court of original jurisdiction. These arguments misstate the law.

First, Plaintiff's argument that the PEGP lacks wholesale authority to award damages is inaccurate. The Grievance Board is authorized to award an aggrieved employee back pay of one year after a favorable ruling. W. Va. Code § 6C-2-3. Even so, Plaintiff's fundamental argument that she was excused from participation in the PEGP because she was dissatisfied with the nature of damages available is also mistaken.

The exhaustion of administrative remedies requirement applies even where a plaintiff is dissatisfied with the nature of the damages available. West Virginia law makes this point clear:

> The rule of exhausting administrative remedies before actions in courts are instituted is applicable, even though the administrative agency cannot award damages, if the matter is within the jurisdiction of the agency. In any event, damages can always be obtained in the courts after the administrative procedures have been followed, if warranted.

*Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 183 S.E.2d 692, 695 (W. Va. 1971).

While acknowledging *Bank of Wheeling*'s holding, Plaintiff nonetheless relies on *CBC Holdings, LLC. v. Dynatec Corp.* in claiming that if complete relief cannot be obtained through the available administrative procedure, failure to exhaust administrative remedies will not preclude litigation. 680 S.E.2d 40 (W. Va. 2009). This reliance is inapposite. In *CBC Holdings*, the plaintiff challenged the defendant's ownership of coalbed methane in a particular seam. *Id.* at 42. The defendant claimed the lawsuit was barred because the plaintiff had failed to exhaust administrative remedies available under the Coalbed Methane Act. *Id.* The West Virginia Supreme Court held that the exhaustion doctrine was inapplicable because the Act was "clearly . . . not aimed at resolving conflicting issues of ownership." *Id.* at 45-46. *CBC Holdings* stands for the proposition that where the administrative process is not equipped to address the substance of the underlying dispute, failure to exhaust will not bar litigation.

The analysis set forth in *CBC Holdings* only further bolsters the Court's finding that Plaintiff cannot avoid the available administrative process based solely on the measure of damages available. In contrast to *CBC Holdings*, Plaintiff's claims raised in Counts II, III, IV, and V are precisely the type of disputes the PEGP was meant to address. The PEGP was expressly created for the purpose of resolving disputes between public employees and their employers. W. Va. Code § 6C-2-1(a). For this reason, the general requirement of exhaustion applies.[2] Plaintiff could have pursued additional damages in the judicial system after the administrative procedures had been followed. *See Bank of Wheeling*, 183 S.E.2d at 695. Because Plaintiff failed to exhaust her available administrative remedies, this Court lacks subject matter jurisdiction over these claims. Defendants' Rule 12(b)(1) motion to dismiss Counts II, III, IV, and V of the Complaint is **GRANTED.**

> 2. *The Grievance Board's Jurisdiction over West Virginia Human Rights Act Claims*

Defendants contend that Plaintiff was similarly obligated to bring her West Virginia Human Rights Act claims before the Grievance Board. Plaintiff argues that the Grievance Board does not have jurisdiction to resolve these claims and that exhaustion of administrative remedies would therefore be futile.

Though the Grievance Board has subject matter jurisdiction over discrimination claims, it has no authority to determine liability under the West Virginia Human Rights Act. Syl. pt. 1, *Vest v. Bd. of Educ. of Cty. of Nicholas,* 455 S.E.2d 781, 782 (W. Va. 1995). In *Vest*, a substitute teacher brought a grievance with the West Virginia Education and State Employees Grievance Board, a predecessor to the PEGP, alleging discrimination by her employer on the basis of

---

[2] The Court's finding, *infra* Section IV(A)(iii), that Plaintiff brings her remaining claims against Defendants in their individual capacities does not change this analysis. The purposes of the PEGP counsel in favor of exhaustion of administrative remedies, whether Plaintiff's lawsuit is now brought against Defendants in their individual or official capacities. *See* W. Va. Code § 6C-2-1(b) (defining one of the PEGP's purposes as the resolution of grievances in a fair, efficient, cost-effective, and consistent manner).

pregnancy and sex. *Id.* She voluntarily relinquished her discrimination claim after the grievance hearing upon the belief that the administrative process was not the proper forum to resolve this claim. She then brought suit in West Virginia circuit court alleging violations of the Human Rights Act. The circuit court certified two questions to the West Virginia Supreme Court asking 1) whether the Grievance Board had subject matter jurisdiction over claims alleging gender-based discrimination, and 2) whether a civil action filed pursuant to the West Virginia Human Rights Act was precluded by the prior grievance proceeding.

First, the court found that the Grievance Board had subject matter jurisdiction over discrimination claims. *Id.* at 783-84 (noting that the definition of "grievance" includes claims by employees alleging discrimination, harassment, or favoritism). The court recognized, however, the potential for considerable overlap between grievances that include claims of discrimination and claims under the Human Rights Act. *Id.* While the court reasoned that the Grievance Board could decide whether an employee had been the subject of discrimination, "there is no authority in the statute for the Grievance Board to decide whether a person states a claim under the Human Rights Act." *Id.* at 784. Instead, interpretation and enforcement of the Act was assigned specifically to the Human Rights Commission and West Virginia state courts. *Id.* (citing W. Va. Code § 5-11-13). In part due to the unavailability of "substantial protections promised under the Human Rights Act" within the grievance procedure, *Id.* at 787, the court held as to the second question that "a civil action filed under the Human Rights Act is not precluded by such a prior grievance which involves the same facts and circumstances." *Id.* at 788.

In the case at hand, Plaintiff's original grievance contained a claim for discrimination on the basis of sex, age, and nationality. Her original grievance did not allege Human Rights Act violations. The Grievance Board had jurisdiction to determine whether Plaintiff had been the target of discrimination—that much is clear. The Grievance Board did not and does not have the

14

authority, however, to determine liability for the Human Rights Act violations Plaintiff now raises before this Court. The law does not require Plaintiff to exhaust administrative remedies where, as here, doing so would have been an exercise in futility.

Defendants attempt to distinguish *Vest* by asserting that in that case, the plaintiff had fully exhausted her available administrative remedies before filing her lawsuit. The Court does not share this view of the facts. In *Vest*, the plaintiff "voluntarily relinquished" her discrimination claim before the administrative law judge ruled on it. 455 S.E.2d at 783-84. Further, because the West Virginia Supreme Court held that the administrative system could not properly address violations of the Human Rights Act, it found it "unnecessary to [address] whether the plaintiff 'actually litigated' her discrimination claim before the Grievance Board." *Id.* at 787.

Similarly, whether and to what extent Plaintiff litigated her discrimination claim before the Grievance Board is irrelevant to the fact that the Board was incapable of addressing the Human Rights Act claims she now presents before the Court. For these reasons, the Court **DENIES** Defendants' motion to dismiss Count I for failure to exhaust administrative remedies.

      iii.      *Eleventh Amendment Immunity*

Finally, Defendants argue that the Eleventh Amendment bars Plaintiff's claims.[3] Defendants reason that the School of Medicine is a de facto parties to this litigation and is, in fact, an agent of the State of West Virginia. In response, Plaintiff insists that she has sued Defendants as individual tortfeasors only. Plaintiff's Complaint is wholly devoid of any explicit pronouncement that she sues Defendants in only their individual capacities.

---

[3] The Fourth Circuit has not definitively established whether a motion to dismiss based on Eleventh Amendment immunity is a 12(b)(1) motion for lack of subject matter jurisdiction or a 12(b)(6) motion for failure to state a claim upon which relief can be granted. *See Andrews v. Daw*, 201 F.3d 521, 525 n. 2 (4th Cir. 2000). The Court assumes, without deciding, that Defendants' Eleventh Amendment argument is properly raised under Rule 12(b)(1).

Eleventh Amendment immunity bars suits against state officials in their official, but not individual, capacities. *See Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 229 (4th Cir. 1997) (citing *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991)). The primary consideration in determining whether state actors are sued in their official or individual capacities is whether the state is "the real party against which the judgment will . . . operate." *O'Neill v. Early*, 208 F.2d 286, 289 (4th Cir. 1953). The Supreme Court has stated "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer*, 502 U.S. at 26.

A minority of circuits have simply adopted a presumption that when a plaintiff's Complaint is unclear, she is presumed to have brought suit against state officials only in their official capacity. *See Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989); *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). The Fourth Circuit, on the other hand, has sided with the majority view and adopted a more flexible approach. *See Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1993). "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Id.* at 61.

In *Biggs*, the Fourth Circuit identified a number of factors used to distinguish between individual and official capacity suits. These include whether the plaintiff alleges that the defendant acted in accordance with a state policy or custom, whether she seeks punitive or compensatory damages, and the nature of the defenses raised. *Id.* at 61. Punitive and compensatory damages are unavailable in official capacity suits. *Id.*; *see Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d. Cir. 1988) (finding a request for punitive damages indicates the personal nature of the lawsuit). Further, since a qualified immunity defense is available only in a personal

capacity suit, the assertion of this defense indicates that the defendant has at least contemplated the possibility that the plaintiff seeks to recover from him personally. *Biggs*, 66 F.3d at 61.

Though the Fourth Circuit in *Biggs* addressed the individual or official capacity distinction in the context of a 42 U.S.C. § 1983 action, the analysis has been similarly applied to causes of action sounding in state law. *See Osborne v. Cty. Cmm'n of Kanawha Cty.*, 143 Fed. Appx. 554, 555 (4th Cir. 2005) (per curiam) (reversing the trial court's finding that local judges had been sued only in their official capacities); *Suarex Corp. Indus. V. McGraw*, 125 F.3d 222, 229 (4th Cir. 1997) (applying the *Biggs* factors to determine whether the plaintiff's intentional tort claims were brought against defendants in their official or individual capacities).

Defendants' claim of Eleventh Amendment immunity focuses mistakenly on the capacity in which they inflicted the alleged injury, *see Hafer*, 502 U.S. at 26, rather than the capacity in which they have been sued. Because Plaintiff has not alleged capacity specifically, the Court now turns to the *Biggs* factors to determine the nature of her remaining claims.

Plaintiff's claims, though inartfully pled, can be construed as claims against Defendants in their individual capacities. The first two of the *Biggs* factors support this interpretation. Plaintiff does not allege Defendants acted in accordance with state policy when they fired her for discriminatory reasons. Neither does she allege they intentionally interfered with her prospective employment with Cabell Huntington Hospital in abidance with state policy or custom. Indeed, Plaintiff alleges Defendants' conduct in this regard was malicious. This interpretation is further strengthened by Plaintiff's requested relief. Plaintiff seeks only compensatory and punitive damages, rather than reinstatement or injunctive relief. As applied to this case, the third *Biggs* factor is inconclusive. Though Defendants have raised qualified immunity as a defense, they have done so only as an alternative basis of relief.

Because the Court views Counts I, VI, and VII of Plaintiff's Complaint as stating a claim against Defendants in their individual capacities, Defendants' motion to dismiss on the basis of Eleventh Amendment immunity is **DENIED**.

B.  Rule 12(b)(6) Motion to Dismiss

i.  *Qualified Immunity*

In the event the Court denies Defendants' motion to dismiss on the basis of Eleventh Amendment immunity, Defendants move to dismiss under a qualified immunity theory. Defendants contend that with the exception of the claims arising under the Human Rights Act, qualified immunity bars Plaintiff's claims.

Qualified immunity is an affirmative defense that must be pleaded by a government agent or official. *See Parkulo v. West Virginia Bd. of Probation and Parole*, 483 S.E.2d 507, 521 (W. Va. 1996) (citing *State v. Chase Securities, Inc.*, 424 S.E.2d 591, 597 (W. Va. 1992)). Qualified immunity protects government officials when acting within the scope of their authority insofar as their conduct does not violate clearly established constitutional or statutory rights. *See Bennett v. Coffman*, 361 S.E.2d 465 (W. Va. 1987). On the other hand, "[t]here is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." *State v. Chase Sec., Inc.*, 424 S.E.2d 591, 594 (W. Va. 1992).

Because Defendants do not argue that qualified immunity shields them from Plaintiff's claims arising under the Human Rights Act, the Court addresses qualified immunity only as it applies to the remaining claims—Counts VI and VII of the Complaint. Taken together, Counts VI and VII allege that Defendants maliciously conspired against Plaintiff and intentionally interfered with her prospective employment contract with Cabell Huntington Hospital. Noting that Defendants have the burden to establish a qualified immunity defense, the Court lacks sufficient evidence to determine at this stage of litigation whether Defendants' actions giving rise

18

to these claims were undertaken within the scope of their employment. The Court will **DENY** the motion in favor of further factual development on this issue.

        ii.        *Civil Conspiracy*

Defendants contend Plaintiff fails to state a claim for civil conspiracy. Defendants assert that their allegedly unlawful actions were all undertaken within the scope of and in the course of their employment duties as agents for the School of Medicine and University Physicians and Surgeons and cannot give rise to a claim for civil conspiracy.

West Virginia law "recognizes a cause of action sounding in civil conspiracy." *Kessel v. Leavitt*, 511 S.E.2d 720, 753 (W. Va. 1998).

> A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

Syl pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 258 (W. Va. 2009).

The Court recognizes that a corporation generally cannot successfully conspire with its employees or agents. *Gray v. Marshall Cty. Bd. of Educ.*, 367 S.E.2d 751, 756 (W. Va. 1988) (citing *Cook v. Hecks, Inc.*, 342 S.E.2d 453, 460 (1986)). However, Plaintiff has neither alleged that Defendants acted as agents of a corporation nor that Defendants' allegedly unlawful actions were undertaken within the scope of their employment as employees of the School of Medicine. Plaintiff avers that Defendants acted in concert in terminating her employment with the School of Medicine and interfering with her prospective employment contract with Cabell Huntington Hospital. Plaintiff states a plausible claim of civil conspiracy. The Court lacks sufficient facts to determine whether any legal defenses may exist to this claim; further, to the extent the Court would have to garner these facts from outside the Complaint, such a determination is inappropriate in response to a 12(b)(6) motion to dismiss.

Because Plaintiff alleges facts sufficient to state a claim for civil conspiracy, Defendants' motion to dismiss Count VII for failure to state a claim upon which relief can be granted is **DENIED.**

### V.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint [Docket 13] is **GRANTED IN PART** and **DENIED IN PART.**  The motion is **GRANTED** as to Counts II, III, IV, and V.  As to Counts I, VI, and VII, the motion is **DENIED.**

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:     September 26, 2012

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE